# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | |
|---|---|
| DONNA K. HAWKS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 7:09cv00519 |
| v. | ) |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Plaintiff Donna K. Hawks ("Hawks") brought this action for review of the Commissioner of Social Security's ("Commissioner") decision denying her claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits under the Social Security Act (the "Act"). Hawks' primary argument on appeal is that the Administrative Law Judge ("ALJ") erred in his evaluation of her back condition prior to and following surgery. Hawks also contends that the ALJ should have placed more weight on her other impairments such as fibromyalgia, rheumatoid arthritis, Raynaud's syndrome, migraine headaches, gastrointestinal issues, as well as her mental impairments. Having carefully reviewed the administrative record and considered the arguments of counsel, the undersigned concludes that the ALJ's decision is supported by substantial evidence. Accordingly, the Commissioner's decision is **AFFIRMED** and the Commissioner's Motion for Summary Judgment (Dkt. #15) is **GRANTED**.

I

Section 405(g) of Title 42 of the United States Code authorizes judicial review of the Social Security Commissioner's denial of social security benefits. Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "'Under the Social Security Act, [a reviewing court] must uphold the

factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct, legal standard.'" Id. (alteration in original) (quoting Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)). "Although we review the [Commissioner's] factual findings only to establish that they are supported by substantial evidence, we also must assure that [his] ultimate conclusions are legally correct." Myers v. Califano, 611 F.2d 980, 982 (4th Cir. 1980).

The court may neither undertake a de novo review of the Commissioner's decision nor re-weigh the evidence of record. Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992). Judicial review of disability cases is limited to determining whether substantial evidence supports the Commissioner's conclusion that the plaintiff failed to satisfy the Act's entitlement conditions. See Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). Evidence is substantial when, considering the record as a whole, it might be deemed adequate to support a conclusion by a reasonable mind, Richardson v. Perales, 402 U.S. 389, 401 (1971), or when it would be sufficient to refuse a directed verdict in a jury trial. Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). Substantial evidence is not a "large or considerable amount of evidence," Pierce v. Underwood, 487 U.S. 552, 565 (1988), but is more than a mere scintilla and somewhat less than a preponderance. Perales, 402 U.S. at 401. If the Commissioner's decision is supported by substantial evidence, it must be affirmed. 42 U.S.C. § 405(g); Perales, 402 U.S. at 401.

"Disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The "[d]etermination of eligibility for social security benefits involves a five-step inquiry." Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002).

This inquiry asks whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his or her past relevant work; and if not, (5) whether he or she can perform other work. Heckler v. Campbell, 461 U.S. 458, 460-462 (1983); Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (citing 20 C.F.R. § 404.1520). If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process, he does not proceed to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Once the claimant has established a prima facie case for disability, the burden then shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"),[1] considering the claimant's age, education, work experience, and impairments, to perform alternative work that exists in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

## II

Hawks was born in 1967 (Administrative Record, hereinafter "R." at 29) and is considered a younger individual under the Act. 20 C.F.R. §§ 404.1563, 416.963. She completed the tenth grade and obtained a GED. (R. 36.) Hawks previously worked as pressing machine operator, day care worker, packer, and sewing machine operator. (R. 29.) She filed an

---

[1] RFC is a measurement of the most a claimant can do despite his or her limitations. See 20 C.F.R. §§ 404.1545(a), 416.945(a). According to the Social Security Administration:

> RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule.

Social Security Regulation (SSR) 96-8p. RFC is to be determined by the ALJ only after considering all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain). See 20 C.F.R. §§ 404.1529(a), 416.929(a).

application for benefits on January 17, 2007, claiming disability as of August 3, 2006[2] based on trochanteric bursitis, fibromyalgia, migraines, Raynaud's syndrome, and diffuse body pain. (R. 19, 167.) Hawks' application for benefits was rejected by the Commissioner initially based on a medical records review by Dr. Shirish Shahane (physical) on February 28, 2007. (R. 287-91.) This decision was confirmed on reconsideration based on a medical records review by Dr. Joseph Duckwall (physical) on July 12, 2007. (R. 294-98.) An administrative hearing was held before an ALJ on June 5, 2008. (R. 65-72.) Following Hawks' back surgery and a consultative psychological evaluation, a supplemental hearing was held on January 13, 2009 (R. 32-64).

In a decision issued on March 12, 2009, the ALJ found that Hawks had severe impairments consisting of fibromyalgia, headaches, degenerative disc disease of the lumbar spine, obesity, arthritis in hips and joints, depression, anxiety, panic disorder and hypertension. (R. 22.) Considering these impairments, the ALJ found that Hawks retained the RFC to perform light work, except that she is limited to tasks requiring no more than occasional balancing, stooping, kneeling, crouching or climbing of ramps/stairs. She must avoid crawling, as well as climbing ladders, ropes, or scaffolds. She cannot operate foot controls with her lower extremities and must avoid concentrated exposure to extreme cold, wetness, fumes, odors, dusts, gases, poor ventilation, heights or hazardous machinery. Due to her mental impairments, Hawks must work in a stable and predictable work environment. (R. 24.) Based on this RFC, the ALJ determined that Hawks cannot perform her past relevant work. (R. 29.) However, given the evidence obtained from the Vocational Expert at the administrative hearing, the ALJ found that Hawks can perform work, such as food preparation worker, cashier, and assembler, that exists in significant numbers in the national economy. (R. 30.) Accordingly, the ALJ concluded that

---

[2] Hawks originally alleged an onset date of June 15, 2004 but later amended it to August 3, 2006. (R. 19, 37.)

Hawks is not disabled under the Act. (R. 30.) The Appeals Council denied Hawks' request for review on November 13, 2009 and this appeal followed. (R. 1-3.)

### III

### A.

The crux of plaintiff's argument on appeal is that the ALJ erred in evaluating her back condition, both before and after surgery, and failed to properly develop the record as regards this impairment and its limiting effects. Hawks claims to have had back pain as of her disability onset in August, 2006 (Pl.'s Br. 4), but medical records from this time period show that her primary complaints were of pain and swelling in her lower extremities. (R. 247, 251, 252.) Indeed, the first specific mention of back pain does not appear in the record until November, 2007.[3] Hawks complained to Deborah Croy, ANP-BC, at Bland County Medical Clinic of low back and hip pain radiating to the back of her knee. (R. 305.) Hawks could not recall any injury that might have caused this pain. (R. 305.) Examination revealed normal curvature of the spine, moderate vertebral spine tenderness, and unremarkable gait. Hawks was able to raise her leg 90 degrees on the right side. (R. 305.) Croy diagnosed Hawks with back pain, prescribed a Medrol Dosepack and Flexeril, and ordered x-rays. (R. 306.) The x-rays showed mild disc space narrowing at L3/4 and 4/5 as well as "some degenerative disc disease at T11/12." (R. 320.)

On December 12, 2007, Hawks reported that "medication helps some" but she continued to experience pain when sitting for a long time. (R. 308.) Examination revealed normal curvature of the spine, tenderness upon palpation, positive straight leg raising at 45

---

[3] Notes from the University of Virginia Rheumatology Clinic on October 6, 2006 do not mention back pain specifically but reference Hawks' complaints of "diffuse body pain that extends from head to toe" (R. 268), despite the fact that just a few weeks earlier on September 15, 2006, Hawks' treating physician, Dr. Milhacea, remarked in her notes, "[s]he does not really complain of pain all over like a classical fibromyalgia patient." (R. 250.)

Additionally, on August 22, 2006, Hawks complained of mild back pain, which appears to have been associated with the urinary tract infection she was experiencing. (R. 251.)

degrees on the right, and an unremarkable gait. (R. 308.) She was treated with Flexeril and potassium chloride. (R. 309.) An MRI taken on December 19, 2007 showed a moderate size posterocentral disc protrusion with mild impingement on the bilateral L4 nerve roots at L3-4, as well as mild stenosis secondary to the disc protrusion. At L4-5 and L5-S1 there was a mild annular disc bulge with concomitant tiny posterocentral disc protrusion. (R. 318.) By letter dated March 25, 2008, Dr. Gregory Helm of the University of Virginia Department of Neurosurgery stated this MRI "demonstrates an L3-4 disk herniation that is probably accounting for her symptoms." (R. 341.) Hawks elected to proceed with a right L3-4 discectomy, which was performed on June 11, 2008. (R. 347-49, 357-59, 362-66.) There were no complications; she tolerated the procedure well and was discharged the next day. (R. 348, 351.) She had no significant issues post-operatively. (R. 351.)

Hawks saw Deborah Croy on July 9, 2008 and reported surgery had not helped with her back pain. She complained of weakness and cramps in her right leg, specifically that her leg "gives out without any warning." (R. 342.) At the time, just after surgery, she was using a walker to ambulate. (R. 343.) Croy prescribed Flexeril and Ultram for back pain. (R. 343.) A letter from Dr. Helm dated July 29, 2008 reveals Hawks complained of muscle spasms and pain in her right leg as well as some numbness in her thigh, which he noted had improved. (R. 345.) Dr. Helm recommended another MRI, which showed degenerative disc and joint disease from L3-4 through L5-S1, mild to moderate central canal stenosis at L4-5, and small postoperative dorsal fluid collection in the midline at L3-4 with a tract extending into the right dorsal epidural space. (R. 368.) In a letter dated August 11, 2008, Dr. Helm remarked this MRI "demonstrates her previous operative site which actually looks quite good with no obvious surgical lesions."

(R. 339.) He noted "further conservative measures are probably the best option for her." (R. 339.)

Hawks did not complain specifically of back pain again until June, 2009, at which time she reported experiencing bad back pain and numbness in her toes. (R. 445.) She stated she had been to the emergency room twice in the previous week,[4] the first time for headaches and spasms in her legs, and the second because "her left side of her face was drawing and she had blurred vision." (R. 445.) Examination revealed positive straight leg raising on the right and tenderness in the lumbrosacral area of her back. (R. 446.) No facial drooping was noted. (R. 446.) Deborah Croy diagnosed Hawks with a transient ischemic attack and scheduled CT of the head, and for back pain, Croy prescribed Soma and Flexeril and referred Hawks back to UVA. (R. 446.) At a follow up appointment on July 22, 2009, Hawks reported that the Soma helped control her pain, which she stated was primarily in her right hip and did not radiate, and she again complained of numbness in her toes. (R. 458.) Croy prescribed Celebrex in addition to Soma. (R. 459.)

Plaintiff argues the ALJ erred "by not completely developing the record in regard to the severity of this claimant's back condition and the residual effects which the condition had on the claimant both prior to her back surgery and after her back surgery." (Pl.'s Br. 4.) Specifically, Hawks takes issue with the ALJ's treatment of two MRIs – the December 2007 pre-operative study and the August 2008 post-operative study. Hawks argues that the ALJ minimized the MRI findings in his decision. (Pl.'s Br. 4-5.)

As regards the December 2007 MRI, the ALJ stated it "showed some evidence of degenerative disc disease." (R. 25.) The MRI report itself does not use the words "degenerative

---

[4] There are no records from these emergency room visits in the administrative record.

disc disease" but describes disc desiccation at L3-4, L4-5 and L5-S1 and a mild annular disc bulge at L4-5 and L5-S1.[5] (R. 318.) Notably, Hawks' neurosurgeon, Dr. Helm, attributed her pain to the disc herniation at L3-4, not to any degenerative disc disease. (R. 341.) This herniation was repaired with surgery in June 2008. Following surgery, Hawks continued to complain of back pain and leg pain and weakness. Given her complaints, Dr. Helm ordered another MRI in August 2008.

With respect to this post-operative MRI, the ALJ stated it showed "lumbar spine well-aligned and normal spinal cord termination. It also showed some degenerative disc disease and joint disease." (R. 26.) Indeed, the report reveals, "[t]he lumbar spine is well-aligned and spinal cord termination is normal." (R. 367.) It also shows "[d]egenerative disc and joint disease from L3-4 through L5-S1," the most noteworthy disease at L3-4, with mild to moderate central canal stenosis at L3-4 and L4-5, but no neuroforaminal stenosis at any level. (R. 368.) Hawks argues these MRI results paint a more severe picture than that described by the ALJ.[6] But Dr. Helm, Hawks' treating neurosurgeon, did not find these results alarming. Rather, he stated the MRI "demonstrates her previous operative site which actually looks quite good with no obvious surgical lesions." (R. 339.) He recommended further conservative treatment. (R. 339.) The record indicates that Hawks sought treatment for a number of ailments over the course of the next ten months, but did not complain specifically of back pain again until June 2009. She continued to treat conservatively with medication such as Soma, Flexeril, Celebrex and Ultram.

---

[5] X-rays from November 2007 showed mild disc space narrowing at L3/4 and 4/5 as well as "some degenerative disc disease at T11/12." (R. 320.) The MRI, however, revealed T11-12 was normal. (R. 318.)

[6] To the extent Hawks takes issue with the ALJ's use of the word "some" when discussing the degenerative disc disease revealed by the MRIs, the court finds the ALJ's description of the MRI reports to be appropriate. While the August 2008 MRI showed degenerative disc disease at L3-4 through L5-S1, the findings at T10-T11 through L2-3 were normal. (R. 368.) Likewise, the December 2007 MRI showed normal findings from T11-12 through L2-3. (R. 318.)

The ALJ did not err in his analysis of Hawks' back impairment or minimize the findings of the two MRIs. In fact, the ALJ found Hawks' degenerative disc disease of the lumbar spine to be a severe impairment. (R. 22.) Prior to her surgery, the reviewing state agency physicians found that Hawks could perform light work. (R. 288, 295.) Records from this pre-surgical period indicate examinations were normal (R. 248, 302), she had 5/5 strength (R. 252, 269), normal range of motion (R. 269), and she did not seek treatment for the first seven months of 2007. At least one doctor recommended she exercise regularly and walk 5 to 6 days per week. (R. 269-70.) Of note, Hawks testified at the administrative hearing that she quit working to care for her husband's niece's children (R. 37-38), not because of her back impairment. Following the June 2008 surgery, a post-operative MRI proved the operative site "looks quite good with no obvious surgical lesions," and Dr. Helm recommended conservative treatment. (R. 339.) There are minimal complaints of back pain in the medical records between August of 2008 and July of 2009, though Hawks sought treatment for edema in her right lower extremity (R. 374), abdominal pain (R. 386), sore throat (R. 422), and migraines (R. 422, 443) during this time period. At the January, 2009 administrative hearing, Hawks testified that she is able to walk without an assistive device. (R. 52.)

Additionally, no doctors have opined that Hawks is disabled. Hawks argues that she lacks the financial resources to secure an RFC evaluation from a physician, stating, "the Bland Free Medical Clinic has a policy that their physicians are not allowed to allocate their resources to completion of these forms, therefore it is impossible for this claimant to produce a residual functional capacity evaluation to contradict the DDS examiners."[7] (Pl.'s Br. 6.) But Hawks also treated with Dr. Helm, a neurosurgeon at the University of Virginia, who never indicated that she

---

[7] The court notes that at Bland County Medical Clinic, Hawks treated with Deborah Croy, ANP-BC, a nurse practitioner who is not an acceptable medical source under the regulations, but whose opinion could be used to show the severity of Hawks' impairment and how it affects her ability to work. 20 C.F.R. §§ 404.1513(d), 416.913(d).

was limited in any activities, let alone her ability to work. Based on this evidence, the court finds that the ALJ did not err in his evaluation of Hawks' back condition.[8]

**B.**

Nor did the ALJ err in his analysis of Hawks' other impairments. With respect to rheumatoid arthritis and fibromyalgia, Hawks complained of ankle pain, leg pain, hip pain and edema in her extremities. Examination revealed trigger points consistent with fibromyalgia. (R. 253, 323.) Rheumatoid arthritis initially was suspected to be the cause of her joint pain[9] (R. 252), but antinuclear antibody (ANA) testing was negative, and her thyroid-stimulating hormone (TSH) and rheumatoid factors were also normal.[10] (R. 251, 263, 265, 268.) Likewise, testing revealed no evidence of deep venous thrombosis. (R. 248-49, 377).

Hawks was treated conservatively for these issues with medication, which she said helped decrease her pain. (R. 41, 302, 308.) In August 2006, treating physician Dr. Milhacea recommended Hawks "go to Wal-Mart and just get herself regular support hose and wear them daily" to help with achiness. (R. 253.) Dr. Milhacea associated Hawks' pain with her body mass index, noting it was placing a strain on her knees and ankles. (R. 251.) She declined to put Hawks on a narcotics contract or order x-rays, stating neither was indicated, and she recommended Hawks take Tylenol for pain and a glucosamine chondroitin supplement. (R. 251.) Hawks was referred to a rheumatologist for further evaluation because she complained of

---

[8] The ALJ had no further obligation to develop the record with respect to Hawks' back impairment. There is sufficient evidence in the record to find that she is not disabled, and thus a consultative examination was not required. 20 C.F.R. §§ 404.1519a(b), 416.919a(b) ("A consultative examination may be purchased when the evidence as a whole, both medical and nonmedical, is not sufficient to support a decision on your claim.").

[9] Hawks has a family history of rheumatoid arthritis. (R. 252.)

[10] Despite these negative test results, a diagnosis of rheumatoid arthritis appears in a treatment record from Dr. Grube on September 7, 2007. The associated note states that Hawks' labs were normal. (R. 304.) There is no indication in the record that subsequent testing showed positive rheumatoid factors. Nonetheless, a diagnosis of rheumatoid arthritis appears in the records from Deborah Croy at Bland County Medical Clinic.

"knots popping up" on her legs in September 2006, and Dr. Milhacea thought a referral was in order "since she is so inquisitive about what these knots are." (R. 250.) Hawks was examined by Dr. Tom Murphy at the University of Virginia Rheumatology Clinic and complained of "diffuse body pain that extends from head to toe." (R. 268.) Examination revealed normal range of motion, 5/5 musculoskeletal strength, no evidence of synovitis, and faint livedo-like[11] patterns on her lower extremities. (R. 269.) Dr. Murphy noted that her symptoms were consistent with trochanteric bursitis and fibromyalgia. X-rays showed calcaneal spurs and suggested Achilles' tendinopathy. He gave her a corticosteroid injection and recommended regular exercise, such as walking 5 or 6 days per week, stress reduction and adequate sleep. (R. 269-70.) He did not feel it was necessary to schedule a follow-up appointment. (R. 270.)

While the record documents Hawks' complaints of migraine headaches, which the ALJ found to be a severe impairment, it does not support Hawks' testimony that these migraines occur four to five times a month and last two to three days each. (R. 43.) Hawks was prescribed medication for her headaches and testified that she "thought it was helping some" but at the administrative hearing, she stated her migraines were "increasing more now so when I got back to the doctor I'm going to talk to her about it again." (R. 43.) While the medical records following the January, 2009 administrative hearing document her complaint of increased migraines, there are no objective findings related to this issue and the medical records from February 16, 2009 do not list migraine headaches as one of Hawks' seven diagnoses. (R. 423.) She reiterated this complaint at an appointment in April and her prescription for propranolol was increased. (R. 444.) A subsequent MRI of the brain was normal. (R. 428.)

---

[11] Livedo is defined as "a discolored spot or patch on the skin, often due to passive congestion." Dorland's Illustrated Medical Dictionary 1060 (30th ed. 2003).

The ALJ found Hawks' Raynaud's syndrome and gastrointestinal issues to be non-severe impairments, and the record supports that determination. Hawks reported a chronic history of Raynaud's phenomenon to Dr. Murphy, a UVA rheumatologist, in October of 2006. (R. 269.) Dr. Murphy's notes state Hawks "characterizes her symptoms of Raynaud's phenomenon as nuisance symptoms that she has gradually learned to live with and did not wish to start any medications for the treatment of this problem at this time." (R. 270.) Hawks was counseled to wear gloves in cold weather and avoid drastic temperature changes. (R. 270.) Dr. Murphy saw no other features suggestive of connective tissue disorder. (R. 270.)

With respect to her gastrointestinal issues, Hawks complained of chronic constipation and bloody stools. An x-ray taken on March 12, 2008 was unremarkable other than documenting constipation. (R. 317.) Hawks was referred to Dr. Robert Benish, a gastroenterologist. (R. 383.) Examination was normal but she had tenderness in her abdominal region. (R. 387.) An upper GI series showed mild gastroesophageal reflux (R. 382) and a barium enema showed mild sigmoid colon diverticulitis. (R. 385.) Hawks was prescribed Nexium. (R. 423.) Hawks continued to complain of constipation and bloody stools and was referred to another gastroenterologist, as she told Deborah Croy she could not afford Dr. Benish's fees for a colonoscopy. (R. 443-44.) Dr. Rubio examined Hawks on May 19, 2009 and noted normal bowel sounds, no distension and no mass, tenderness in the left upper and lower quadrants, no rebound and no guarding. (R. 431.) Hawks had a hemorrhoid at the five o'clock position, had normal sphincter tone, and was mildly tender with no masses. (R. 431.) Hawks was diagnosed with chronic constipation and advised to take Miralax or Amitiza and increase her intake of dietary fiber and fluid. (R. 431.) Dr. Rubio thought her bloody stools were possibly related to hemorrhoids and she was referred for a

colonoscopy, the results of which do not appear in the record. (R. 431.) Dr. Rubio prescribed Prilosec for her GERD. (R. 431.)

The ALJ properly evaluated all of Hawks' physical impairments and accounted for them in his RFC determination. He limited Hawks to light work that requires no more than occasional balancing, stooping, kneeling, crouching or climbing of ramps/stairs. (R. 24.) He determined she must avoid climbing ladders, ropes and scaffolds, and found she could never crawl. (R. 24.) He also determined that Hawks must never operate foot controls with her lower extremities, given her complaints of pain and weakness, and must avoid concentrated exposure to extreme cold, wetness, fumes, odors, dusts, gases, poor ventilation, heights or hazardous machinery on account of her migraine headaches and other impairments. (R. 24.) This RFC determination is consistent with the opinions of the reviewing state agency physicians and the record as a whole.

The ALJ also properly took into account Hawks' mental impairments. He found her depression, anxiety, and panic disorder all to be severe. (R. 22.) Given these impairments, the ALJ limited her to a stable and predictable work environment. (R. 24.) The ALJ's assessment of Hawks' mental health issues is supported by the record.

Treatment notes from Deborah Croy reveal Hawks' moods were controlled with Cymbalta and that it helped her depression. (R. 305, 308.) In November, 2007, she complained of occasional episodes of anxiety and was prescribed BuSpar. (R. 305-06.) The ALJ referred Hawks for a consultative psychological evaluation, which was performed by Dr. Carusi on July 28, 2008. A mental examination was normal, and Dr. Carusi noted Hawks' judgment and insight were adequate, and she was oriented to person, place, time and situation. (R. 334.) The Minnesota Multiphasic Personality Inventory -2 (MMPI-2) testing indicated Hawks was defensive and had a tendency to over-report her symptoms, such that the test results were invalid.

(R. 334.) Dr. Carusi found that based on Hawks' self-report, she meets the criteria for major depressive disorder, generalized anxiety disorder and panic disorder. But he also described her self-report as "questionable" (R. 334) and noted her tendency to over-report symptoms (R. 335). Dr. Carusi pegged her Global Assessment of Functioning (GAF) at 58.[12] On the accompanying Medical Source Statement of Ability to do Work-Related Activities (Mental), Dr. Carusi noted Hawks' ability to understand, remember and carry out instructions was not limited by her impairments, that she had mild restrictions in her ability to interact appropriately with the public and mild to moderate limitations in her ability to respond appropriately to usual work situations and to changes in a routine work setting. (R. 336-37.)

Hawks attempted to seek treatment from Mount Rogers Community Counseling Services but after reviewing her case, they decided to place her on a waiting list given staffing shortages. (R. 425.) Nurse Deborah Croy recommended that Hawks contact Twin County instead and noted "she is agreeable to doing so and plans to call them." (R. 443.) While an office note from Croy dated May 18, 2009 states "pt is going to see counselor" (R. 447), there are no such counseling notes in the administrative record. On this same date, Hawks reported that her depression was worsening and that Cymbalta was no longer helping. (R. 447.) Croy stated she would refer Hawks to the UVA Department of Psychiatry, but again, none of these records appear in the administrative record. Notably, during Hawks' next visit to Deborah Croy on June 10, 2009, she did not complain of depression, and it was not listed as one of her diagnoses. (R. 445-46.) At an appointment in July, Hawks stated she "is doing better with medication change [and] is sleeping better …." (R. 458.) The court also notes that Hawks did not list mental health

---

[12] The Global Assessment of Functioning, or GAF, scale ranges from 0 to 100 and considers psychological, social and occupational functioning on a hypothetical continuum of mental health illness. Diagnostic & Statistical Manual of Mental Disorders 34 (4th ed. Text Rev. 2000) (hereinafter "DSM-IV-TR"). A GAF of 51-60 indicates moderate symptoms or moderate difficulty in social, occupational or school functioning. DSM-IV-TR at 34.

concerns in her application for disability benefits. (R. 167.) The ALJ properly evaluated Hawks' mental health concerns and accounted for them in his RFC determination.

**C.**

The clinical findings and evidence of record simply do not support the degree of limitation Hawks claims to suffer in this case. A claimant's statements alone are not enough to establish a physical or mental impairment. 20 C.F.R. §§ 404.1528(a), 416.928(a). Subjective evidence cannot take precedence over objective medical evidence or the lack thereof. Craig v. Chater, 76 F.3d 585, 592 (4th Cir. 1996) (quoting Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986)).

When faced with conflicting evidence contained in the record, it is the duty of the ALJ to fact-find and to resolve any inconsistencies between a claimant's alleged symptoms and her ability to work. Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996); accord Melvin v. Astrue, No. 606cv32, 2007 WL 1960600, at *1 (W.D. Va. July 5, 2007). Accordingly, the ALJ is not required to accept Hawks' testimony that she is disabled by pain and mental impairments. Instead, the ALJ must determine through an examination of the objective medical record whether Hawks has proven an underlying impairment that could reasonably be expected to produce the symptoms alleged. Craig, 76 F.3d at 592-94 (stating the objective medical evidence must corroborate "not just pain, or some pain, or pain of some kind or severity, but the pain the claimant alleges she suffers."). The ALJ must determine whether Hawks' testimony about her symptoms is credible in light of the entire record. Credibility determinations are in the province of the ALJ, and courts normally ought not interfere with those determinations. See Hatcher v. Sec'y of Health & Human Servs., 898 F.2d 21, 23 (4th Cir. 1989); Melvin, 2007 WL 1960600, at *1; SSR 95-5p.

The ALJ found Hawks' statements concerning the intensity, persistence and limiting effects of her symptoms not credible to the extent they are inconsistent with the ALJ's RFC determination. (R. 25.) Substantial evidence supports the ALJ's credibility determination in this regard. Hawks' testimony that she has to lie down three to four times per day for thirty to forty-five minutes multiple times per week (R. 42), that she "can't do anything that involves lifting because of [her] back and bending over" (R. 48), that she can sit for only thirty minutes at a time (R. 49), and that she can walk for only fifteen to twenty minutes (R. 50), is not corroborated by the objective medical evidence or the record as a whole. Hawks quit working not because of her impairments but to take care of her children. (R. 37-38.) She testified at the administrative hearing that she is able to get her kids ready for school each day (R. 40), she takes pain medication that helps with her back spasms (R. 41), and she does not use any assistive device to walk (R. 52). On a disability form filled out in February 2007, prior to back surgery and at a time when she complained of diffuse body pain, Hawks indicated she was able to do housework for four or five hours every day, do laundry for three or four hours every day, cook meals, clean the dishes, take walks in the evenings, feed her pets, and grocery shop once or twice per week. (R. 177-180.) Testing at a consultative psychological examination indicated Hawks was defensive and had a tendency to over-report symptoms and problems in her life, such that the test results were considered invalid. (R. 334.) Consultative examiner Dr. Carusi found her self-report to be "questionable." (R. 334.) Given this evidence, the court finds no reason to disturb the ALJ's credibility determination. As such, the Commissioner's decision is **AFFIRMED**.

## IV

At the end of the day, it is not the province of the court to make a disability determination. It is the court's role to determine whether the Commissioner's decision is

supported by substantial evidence, and, in this case, substantial evidence supports the ALJ's decision. In recommending that the final decision of the Commissioner be affirmed, the undersigned does not suggest that Hawks is free from all infirmity. Careful review of the medical records compels the conclusion that Hawks has not met her burden of establishing that she is totally disabled from all forms of substantial gainful employment. The ALJ properly considered all of the subjective and objective factors in adjudicating Hawks' claim for benefits. It follows that all facets of the Commissioner's decision in this case are supported by substantial evidence. Accordingly, the Commissioner's decision is **AFFIRMED** and the Commissioner's Motion for Summary Judgment (Dkt. #15) is **GRANTED**.

The Clerk is directed to send a copy of this Memorandum Opinion and accompanying Order to counsel of record.

Entered: July 18, 2011

*/s/ Michael F. Urbanski*

Michael F. Urbanski
United States District Judge